**ALEXANDER MORRISON + FEHR LLP**
Michael S. Morrison (State Bar No. 205320)
Jacqueline Gil (State Bar No. 324482)
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
T: 310.394.0888 | F: 310.394.0811
E: mmorrison@amfllp.com | jgil@amfllp.com

**EMPLOYEE RIGHTS ATTORNEY GROUP**
Diana Gevorkian, Esq. (State Bar No. 275598)
9595 Wilshire Blvd., Suite 900
Beverly Hills, California 90212
T: (310) 300 – 3435
E: diana.gevo@employeerightsattorneygroup.com

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

ED CV 23 - 01266-SSS(AGRx)

| | |
|---|---|
| UNITED STATES and the STATE OF CALIFORNIA ex rel., NATALIE DE ROSE, an individual, DOREEN SAVEDRA, an individual, AMY KARP, an individual, on behalf of themselves, all others similarly situated, the general public,<br><br>       Plaintiffs,<br><br> vs.<br><br>PACIFIC DERMATOLOGY INSTITUTE, INC., a California corporation, IRYNA KINZER, an individual, DR. ERIC SAKO, an individual, JONATHAN COX, an individual, JEFF BOTTOMLEY, an individual, and DOES 1 through 10, inclusive,<br><br>       Defendants. | Case No:<br>Judge:<br>Dept.:<br><br>**FILED UNDER SEAL PURSUANT TO Cal. Gov. Code § 12652(c) and 31 U.S. Code § 3730**<br><br>**COMPLAINT**<br><br>1. Violation of Federal False Claims Act 31 U.S.C. § 3729(a)(1)<br>2. Violation of Federal False Claims Act 31 U.S.C. § 3729(a)(2)<br>3. Violation of California False Claims Act, Cal. Govt. Code § 12651 *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

  PLAINTIFFS/RELATORS  NATALIE DE ROSE, DOREEN SAVEDRA,

AMY KARP complain and allege the following against PACIFIC DERMATOLOGY

INSTITUTE, INC., IRYNA KINZER, DR. ERIC SAKO, JONATHAN COX, JEFF

BOTTOMLEY, and DOES 1 through 10 ("Defendants"):

## INTRODUCTION

1.      Defendant PACIFIC DERMATOLOGY INSTITUTE, INC. ("PDI") is a medical provider specializing in dermatology-related services with over fifteen (15) locations throughout Southern California. For years, Defendant PDI has knowingly overbilled the Government using the same or similar billing tactics as other medical providers specializing in dermatology services who have been held accountable under the False Claim Act.[1] Defendant PDI knowingly and systematically submitted false claims for payment to the Centers for Medicare and Medicaid Services and MediCal ("CMS") including, but not limited to: (a) claiming a medical necessity for the cosmetic removal of benign skin lesions; (b) upcoding multiple diagnostic biopsies that were completed during a single visit as "performed independently or unrelated or distinct from other procedures/services provided at that time," when in fact a corresponding add-on code should have been used; (c) falsely adding evaluation and management services during a visit; (d) upcoding intermediate excisions as complex; and (e) charging for an inordinate amount of liquid nitrogen doses that, in reality, were never provided. On information and belief, this fraud is ongoing.

2.      Relators seek to recover damages and civil penalties on behalf of the United States and the State of California, as qui tam relators pursuant to the False Claims Act, 31 U.S.C. §§3729 *et seq.* (the "FCA" or the "Act") and the California False Claims Act, Cal. Govt. Code §§ 12651 *et seq.*

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 under the Federal False Claims Act.

---

[1] *See* https://oig.hhs.gov/fraud/enforcement/dermatology-physicians-and-practice-to-pay-19-million-to-settle-false-claims-act-investigation-into-overbilling-medicare-for-evaluation-and-management-services/ ; *See also* https://www.linkedin.com/pulse/dermatology-services-provider-settles-whistleblower-claim-alan-olson

COMPLAINT; DEMAND FOR JURY TRIAL

4.    This Court has personal jurisdiction over each Defendant because each Defendant transacts business and/or resides in the State of California.

5.    Venue of this action is proper in this this judicial district by virtue of 28 U.S.C. §1391 because, among other things, the acts complained of occurred in this judicial district and because each Defendant transacts business in California.

6.    Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over the subject matter of the claim brought pursuant to the California False Claims Act on the ground that the claim is so related to the claims within this Court's original jurisdiction that they form the same case or controversy under Article III of the United States Constitution.

**PARTIES**

7.    Relator NATALIE DE ROSE  is a citizen of the United States of America and of the State of California who resides in San Bernardino County, California. Relator De Rose was employed as Defendant's Director of Operations from October 2013 until her resignation on January 5, 2023.

8.    Relator DOREEN SAVEDRA is a citizen of the United States of America and of the State of California who resides in San Bernardino County, California. Relator Savedra was employed as an Office Manager and Medical Assistant throughout her employment with Defendant from September 25, 2019 through June 23, 2021.

9.    Relator AMY KARP is a citizen of the United States of America and of the State of California who resides in San Bernardino County, California. Relator Karp was employed as Defendant's Human Resources Director from September 9, 2019 through February 14, 2021.

10.    Defendant PDI is a corporation incorporated in the State of California and does business in the Central District of California. In doing the acts alleged, PDI employees, subcontractors, and agents of PDI acted within the course and scope of their employment and agency with PDI. Defendant PDI is a "person" within the

meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

11.     The PDI website touts itself as the "premier provider of dermatological services in Southern California." PDI has "24 providers" in "15 different locations throughout Southern California" including:  Apple Valley, Chino Hills, Corona, Hemet, Murrieta, Palm Desert, Palm Springs, Redlands Ford, Redlands Terracina, Riverside, San Bernardino, Upland, Temecula, Victorville, and Yucca Valley.

12.     Relators are informed and believe, and thereon allege that Defendant IRYNA KINZER, is a natural person residing in the State of California. Relators are informed and believe, and thereon allege that Defendant Kinzer was at all relevant times a Physician Assistant of Defendant PDI. Defendant Kinzer is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

13.     Relators are informed and believe, and thereon allege that Defendant ERIC SAKO, M.D. is a natural person residing in the State of California. Relators are informed and believe, and thereon allege that Defendant Sako was at all relevant times a medical provider for Defendant PDI. Defendant Sako is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

14.     Relators are informed and believe, and thereon allege that Defendant JONATHAN COX is a natural person residing in the State of California. Relators are informed and believe, and thereon allege that Defendant Cox was at all relevant times a Physician Assistant with Defendant PDI. Defendant Cox is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

15.     Relators are informed and believe, and thereon allege that Defendant JEFF BOTTOMLEY is a natural person residing in the State of California. Relators are informed and believe, and thereon allege that Defendant Bottomley was at all relevant times the Chief Operating Officer of Defendant PDI. Defendant Bottomley is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

16.     The true names and capacities—whether individual, corporate, associate,

COMPLAINT; DEMAND FOR JURY TRIAL

or otherwise—of Defendants sued herein as DOES 1 to 10, inclusive, are currently unknown to Relators. Relators thus sue such Defendants by such fictitious names. Relators will seek leave of Court to amend this Complaint to reflect the true names and capacities of Defendants designated here as DOES when such identities become known.

17.     Relators are informed and believe and on that basis allege that the allegations in this complaint have not been publicly disclosed.

18.     Relators have complied with the California and Federal False Claims Act by providing the information upon which the allegations of this complaint are based to the Attorney General of the United States of America and of the State of California, and the United States Attorney for the Central District of California. Relators' disclosure statement is supported by material evidence known to them as their filings establishing the existence of Defendants' false claims. Because the statement includes attorney-client communications and work product of Relators' attorneys and is submitted to the Attorneys General and to the United States Attorney for the Central District of California in their capacity as potential co-counsel in the litigation, the Relators understand the disclosure statement to be privileged and confidential.

19.     Relators are informed and believe and on that basis allege that all of the acts complained of either (i) occurred within the last six years or (ii) within the last ten years and that the United States government neither knew, nor should have known of the violation of the False Claims Act within the last three years.

20.     The United States is named a Plaintiff pursuant to the False Claims Act, 31 U.S.C. §3729, et seq., as funds of the United States have been directly or indirectly disbursed and awarded to Defendants, as a result of the knowingly false statements, false claims and/or false records alleged in this Complaint made by or caused to be made by Defendants.

21.     The State of California is named a Plaintiff pursuant to the California

False Claims Act, Cal. Govt. Code §§12650, *et seq.*, as funds of the State of California have been directly or indirectly disbursed and awarded to Defendants as a result of the knowingly false statements and false claims alleged in this Complaint made by or caused to be made by Defendants. California funds were misappropriated as a result of Defendants' illegal scheme. California contributes state money to the Medicaid program, funds which were wrongfully tapped to pay Defendants' false claims, and Defendants' false claims caused money to be paid to Defendants out of California's Medi-Cal program.

## ALLEGATIONS

22.     Defendants are engaging in five types of fraudulent billing practices that have led to Medicare paying out false claims:

    (1)     claiming a medical necessity for the cosmetic removal of benign skin lesions;

    (2)     upcoding multiple diagnostic biopsies that were completed during a single visit as "performed independently or unrelated or distinct from other procedures/services provided at that time," when in fact a corresponding add-on code should have been used;

    (3)     falsely adding evaluation and management services during a visit;

    (4)     upcoding intermediate excisions as complex; and

    (5)     charging for an inordinate amount of liquid nitrogen doses that, in reality, were never provided.

23.     PDI makes millions annually from this practice and mandates that its providers engage in the same by (a) terminating providers that that did not rank as "super billers" and (b) incentivizing providers through its bonus structure to overbill for services.

    a. For example, on information and belief, Physician Assistant, Johnathan Nicolaisen, was terminated after being reprimanded for underbilling. Nicolaisen was shown the bills for "super billers" as an

exemplar for performance, one of which indicated that the provider repeatedly billed for two separate office visits on the same day to the same clinic with the same provider.

    b. PDI maintains an "Assessment and Performance Improvement program" in which provider bonuses are dependent, in part, on "potential earnings generated by PVU's & collections." Nicolaisen and other PAs were ultimately terminated after they were deemed low billers because they refused to engage in Defendants' mandated upcoding practices.

24. As described above, on information and belief, PDI's disciplinary and bonus structure, which punishes correct coding and rewards illegal upcoding, was implemented and enforced by PDI Chief Operating Officer, Defendant Bottomley.

25. PDI, by and through its agents, including Defendant Jonathan Cox, Physician Assistant, mandate that medical assistants and scribes upcode by: (1) telling medical assistants during mandatory morning meetings that every patient who comes into the office for liquid nitrogen will require at least 14 units; (2) teaching staff to evade the electronic medical record system's ("EMR") requirement to indicate where liquid nitrogen was sprayed instead opting for manual entries of dosage information; and (3) providing medical assistants with a bullet point list of "patient complaints" to use for every patient in order to ensure an upcode for evaluation and management services.

26. PDI, by and through its agents, including Defendants Dr. Eric Sako and Mr. Cox, mandate that medical assistants and scribes upcode by using a "separate and unidentifiable" option when multiple diagnostic biopsies were completed during a single visit, rather than using the required corresponding add-on code.

**A. Upcoding The Removal of Benign Skin Lesions.**

27. Medicare reimburses for the removal of malignant skin lesions and some non-malignant skin lesions if there are specific conditions present that are clearly

documented in the medical record that indicate removal as a medical necessity.

28.    In both circumstances, providers are required to use the code that best describes the procedure, the location and the size of the lesion.

29.    Removal of certain benign skin lesions that do not pose a threat to health or function, are considered cosmetic and as such are not covered by the Medicare program. Title XVIII of the Social Security Act §1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury. PDI medical providers, including Defendant Cox "treated" conditions that were not covered by Medicare by mischaracterizing them and coding benign growths as medically necessary in order to bill Medicare for their removal.

30.    Relator Savedra served as a scribe for Defendnant Cox.  Relator Savedra observed Cox use a dermascope to determine whether a skin lesion was benign. When the patient wanted a benign lesion removed for cosmetic purposes, Cox ordered Relator Savedra to enter a medical necessity code in the EMR, even where there were  no complaints or evidence of medical necessity. For example, even where the patient made no complaints of irritation and where there was no evidence of irritation, Cox required scribes, including Relator Savedra, to mark the lesion and its removal as an "irritated" skin lesion requiring a medically necessary removal.

31.    Relator Savedra observed Cox's patients' files indicate that he routinely removed multiple "medically necessary" benign lesions in a single visit when the patient only had cosmetic benign lesions.

32.    Relator Savedra observed this same process reoccur daily during her employment at PDI.

33.    In fact, returning patients would often be billed for the same amount of "medically necessary" removals on follow-up visits, indicating that either the medical providers failed to remove all lesions on the first visit, or that the patients were suffering from rarely-observed repeated re-growths in the same quantity as the initial

visit.

34.     Relator Savedra noticed this with virtually all of Cox's lesion-removal patients during her employment at PDI.

**B.     Upcoding Add-on Codes for Multiple Removals of Skin Tags That were Completed During a Single Visit.**

35.     Medicare reimburses $81.23 for one (1) to fifteen (15) skin tags and progressively less for each additional removal up to ten (10). Where medical providers are removing multiple skin tags in the same day, the providers are required to use the highest billing code for the first fifteen and then the corresponding add-on code for any subsequent removals in the same day.

36.     The add-on codes are less than half of the reimbursement price of an initial removal:

| Code | Description | Facility Price |
|------|-------------|----------------|
| 11200[2] | REMOVAL OF SKIN TAGS, MULTIPLE FIBROCUTANEOUS TAGS, ANY AREA; UP TO AND INCLUDING 15 LESIONS (I.E. <15) | $81.23 |
| 11201 | REMOVAL OF SKIN TAGS ADD-ON (I.E. EACH ADDITIONAL 10 LESIONS, OR PART THEREOF) | $17.14 |

37.     Where there is a significant, separately identifiable evaluation and management service by the same physician on the same day of the procedure and the patient's condition requires a significant evaluation and management service above and beyond the other service provided, the physician may add a modified -25 to the appropriate level of service. Rather than use the required add-on code, PDI used the "separate and unidentifiable" option to bill at the higher code amount for each removal. This allows PDI to recover one hundred percent of the allowed amount, rather than the

---

[2] These amounts are based on April 2023 changes to the Physician Fee Schedule, as promulgated and published on the cms.gov website, and assumes that PDI billing is made in San Bernadino County.

reduced add-on amount.

38.     Defendant Dr. Sako taught and mandated that Relator Savedra and other medical assistances use the separate and unidentifiable option to increase billing.

39.     Defendant Cox also mandated that medical assistants, including Relator Savedra, use the option even where inappropriate for the procedures actually used. Relator Savedra observed Defendants Dr. Sako's and Mr. Cox's patients' files indicate that PDI routinely used this option to bill at the higher codes for all removals.

40.     Relator Savedra observed this same process reoccur daily during her employment at PDI.

**C.     Adding False Evaluation and Management Services.**

41.     When patients come in for a specific procedure (e.g. to remove a pre-cancer), a doctor should bill for the procedure but not the office visit because the cost of a consultation for the medical procedure is already included in the reimbursement amount. The doctor should simply submit the code for that procedure and Medicare reimburses accordingly.

42.     Removal of benign lesions is elective surgery and generally pre-scheduled. It is inappropriate to report a separate evaluation and management service with a -25 modifier on the same date of service as these surgeries for the usual pre/post-operative care associated with these surgeries.

43.     If patients come in for specific procedures and, during their appointments, complain about something else and the medical provider provides a consultation, then it is appropriate to bill for an office visit (i.e. "Evaluation and Management Services"). For example, a patient might say "I have a rash," and the provider would provide a consultation on the rash.  In that circumstance, the provider can indicate an "Evaluation and Management Services" ("E&M") code for each diagnosis, which then corresponds to a particular pre-determined consultation time.

44.     Regularly, PDI agent Defendant Cox falsely stated on patient EMRs that the patient complained about a list of symptoms including headache and rash. The list

1  of pre-determined symptoms was written and delivered to medical assistants via a post-
2  it note in the morning huddle and/or were included in Cox's pre-drafted protocols in
3  the EMR, which would insert automatic text in the patient's EMR that would trigger
4  an E&M code. Medical assistants were regularly required to either enter the pre-
5  determined list into the EMR or use Cox's protocols.

6      45.    Often, Cox mandated that the E&M codes be entered even before the
7  patients were seen by a medical provider.

8      46.    Relator Savedra observed Cox use the E&M code falsely every day during
9  her employment. It is extremely unlikely that Cox's patients were complaining about
10  headaches and rashes at every office visit, which is what his bills to Medicare would
11  suggest.

12     47.    Relator Savedra reported Cox's false use the E&M code to Defendant
13  Bottomley. In response, Bottomley instructed Relator Savedra that PDI could "get
14  away with it" if you ask the patient if anything has changed since the last time the
15  patient came in. If the patient reports that nothing has changed, Defendant Bottomley
16  instructed, you can technically keep the symptoms in their chart even without
17  confirming the veracity of the E&M symptoms listed on the previous visit.

18     **D.    Upcoding Excisions.**

19     48.    Medical providers perform an "excision" where there is a skin lesion that
20  needs to be removed.

21     49.    As described above, the codes for the excisions are based on different
22  body parts, complexity, and the size.

23     50.    Excisions billed by Defendants Cox and Kinzer were regularly treated as
24  "complex" despite the body parts, complexity, and the size, allowing them to up code
25  for higher-rate excisions.

26     **E.    Upcoding Liquid Nitrogen Doses.**

27     51.    The process of removing many lesions (whether benign or pre-cancerous)
28  is quick. The doctor sprays liquid nitrogen from a canister onto the skin; it takes about

1    three seconds to remove one growth.  This is referred to as "Cryosurgery."

2          52.     Billing is done based on the number of lesions. For example:

| Code | Description | Reimbursement |
|------|-------------|---------------|
| 17000 | DESTRUCTION (EG. CRYOSURGERY), PREMALIGNANT LESIONS; FIRST LESION | $58.09 |
| 17003 | DESTRUCTION (EG. CRYOSURGERY), PREMALIGNANT LESIONS; 2-14 LESIONS | $2.12 |
| 17004 | DESTRUCTION (EG. CRYOSURGERY), PREMALIGNANT LESIONS, 15 OR MORE LESIONS (SHOULD NOT BE USED WITH 17000 OR 17003) | $104.23 |

13          53.     PDI's EMR required medical assistants and scribes to tap a location on a
14    diagram to indicate where the medical provider actually sprayed liquid nitrogen.
15    However, Cox and other PDI medical providers instructed scribes and medical
16    assistants to stop counting as they observed the procedure and later to subvert the
17    system and manually enter the number of liquid nitrogen sprays that he unilaterally
18    determined.

19          54.     In morning huddles, Cox told Relator Savedra and other medical
20    assistants that no one is going to come into this office and need less than 14 nitrogen
21    sprays and mandated that no assistants select code 17000 and that in every
22    circumstance where liquid nitrogen is used, assistants should select code 17004.

23          55.     Cox's patients' records indicate that almost all patients who received
24    liquid nitrogen were coded at 17004, seeking reimbursement for services that were not
25    actually provided.

26          56.     Defendants had a practice of improperly and knowingly coding – both in
27    medical charts and in billing to the Federal and California healthcare programs –

28

dermatology services as defined above. This resulted in false claims being submitted to the Government, via the Medicaid and Medicare programs. The Government paid higher levels of reimbursement than it would have paid had the services been properly billed.

57.    Each of the types of false claims described above constitute express false certifications of compliance with the conditions of payment set forth in the relevant regulations. Defendants made an express representation to the government that the services in question were performed.    The rates requested pursuant to the false certifications submitted by Defendants were higher than the rates the government would have paid if Defendants accurately disclosed the services for which reimbursement was sought.

58.    In so doing, Defendants falsely described the services for which they sought reimbursement and actively concealed its failure to comply with the conditions of payment the government set forth in the regulations described above. Had Medicare known the truth, it would not have reimbursed Defendants at the rates Defendants requested.

### FIRST CAUSE OF ACTION
**VIOLATION OF FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)**
**By Realtors Against Defendants**

59.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

60.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

61.    Moreover, Defendants knowingly retained, or caused to be retained, overpayments received from the United States Government, as a result of the conduct alleged herein.

62.   As a result of these false or fraudulent claims, the United States Government suffered damages.

### SECOND CAUSE OF ACTION

### VIOLATION OF FEDERAL FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(2)

### By Realtors Against Defendants

63.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

64.   Defendants knowingly made, used, or caused to be made or used, false records and statements to obtain the United States Government's payment of false or fraudulent claims.

65.   The false records and statements included, but may not be limited to, the representations made in Defendant's billings to the United States Government and its agents, through explicit and implicit certifications of compliance with federal regulations, statutes, and program instructions in order to get paid by the United States government.

66.   As a result of these false records or statements, the United States Government suffered damages.

### THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA FALSE CLAIMS ACT

### CAL. GOVT. CODE §§ 12651 *et seq.*

### By Realtors Against Defendants

67.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

68.   Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

69.   Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices,

requests for reimbursement, and records of services in order to obtain payment or approval of changes to the Medi-Cal program that were higher than Defendant was permitted to claim or charge by applicable law.

70. Defendants also knowingly retained overpayments from the State of California based upon its campaign of unlawful billing for dermatology services.

71. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

72. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' acts, as alleged herein.

73. The conduct of Defendants violated Government Code section 12651(a)(1), (2), and (8) and caused California to sustain damages in an amount according to proof pursuant to Government Code section 12651(a).

74. By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, jointly and severally, as follows:

1. A permanent injunction requiring Defendants to cease and desist from violating the federal False Claims Act and the California False Claims Act;

2. Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendant's unlawful conduct;

3. Judgment against Defendants in an amount equal to three times the amount of damages the state of California has sustained as a result of the Defendants'

1    unlawful conduct;

2        4.    Civil monetary penalties for each false and fraudulent claim submitted to

3    the United States and the State of California by Defendants;

4        5.    An award to Relators pursuant to 31 U.S.C. §3730(d);

5        6.    An award to Relators pursuant to Cal. Govt. Code §12652;

6        7.    An award of reasonable attorneys' fees, costs, and expenses pursuant to

7    31 U.S.C. §3730(d), Cal. Govt. Code §12652; and

8        8.    Such other relief as the Court deems just and equitable.

9

10    Dated:                          Respectfully submitted,

11
                                      **ALEXANDER MORRISON + FEHR LLP**
12                                    **EMPLOYEE RIGHTS ATTORNEY GROUP**

13

14                                    By:_____

15                                        Michael S. Morrison
                                          Jacqueline Gil
16                                        Diana Gevorkian

17                                        Attorneys for Realtor/Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT; DEMAND FOR JURY TRIAL

1

## DEMAND FOR JURY TRIAL

2    Plaintiffs demand a trial by jury on all issues so triable.

3

4    Dated:                              Respectfully submitted,

5                                        **ALEXANDER MORRISON + FEHR LLP**
                                         **EMPLOYEE RIGHTS ATTORNEY GROUP**
6

7                                        By: _____

8                                            Michael S. Morrison

9                                            Jacqueline Gil
                                             Diana Gevorkian

10                                           Attorneys for Realtor/Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT; DEMAND FOR JURY TRIAL